**LODGED**
CLERK, U.S. DISTRICT COURT
06/12/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DVE _____ DEPUTY

# UNITED STATES DISTRICT COURT

for the

Central District of California

**FILED**
June 12, 2023
CENTRAL DISTRICT OF CALIFORNIA
SOUTHERN DIVISION AT SANTA ANA
BY _Nancy Boehme_
Deputy Clerk, U.S. District Court

United States of America

v.

Chance BRANNON and Tibet ERGUL,

Defendants

Case No. 8:23-mj-00304-DUTY

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date of March 13, 2022, in the county of Orange in the Central District of California, the

defendants violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 844(i) | Use of an Explosive or Fire to Damage Real Property Affecting Interstate Commerce |

This criminal complaint is based on these facts:

 *Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*/s/ Jennifer Hirsch*
*Complainant's signature*

_____
Jennifer Hirsch, Special Agent
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim P. 4.1 by telephone.

Date:  June 12, 2023

_____
*Judge's signature*

City and state:  Santa Ana, California

Hon. Douglas McCormick, U.S. Magistrate Judge
*Printed name and title*

AUSA: Kathrynne Seiden (x0631)

## AFFIDAVIT

I, Jennifer Hirsch, being duly sworn, declare and state as follows:

## I.  INTRODUCTION

1.  I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since 2018.  I am currently assigned to FBI Los Angeles Division's Long Beach Resident Agency Domestic Terrorism Squad, which investigates residents of the United States who use force or violence in furtherance of a political and/or social agenda in violation of federal law.  As an FBI Special Agent, I have received both formal and informal training from the FBI and other institutions regarding domestic and international terrorism.  As a special agent, I have participated in various aspects of criminal and national security investigations, including executing physical search and arrest warrants, interviewing suspects, and seizing and searching digital devices from domestic terrorism targets.

## II. PURPOSE OF AFFIDAVIT

2.  This affidavit is made in support of a criminal complaint against, and arrest warrants for, TIBET ERGUL ("ERGUL") and CHANCE BRANNON ("BRANNON") for violations of 18 U.S.C. § 844(i) (Use of an Explosive or Fire to Damage Real Property Affecting Interstate Commerce).

3.  This affidavit is also made in support of search warrants for: the person of ERGUL, as described more fully in Attachment A-1; the person of BRANNON, as described more fully in Attachment A-2; the apartment and garage space at ███████████

████████████, Irvine, California 92603 ("SUBJECT RESIDENCE 1"), as described more fully in Attachment A-3; the residence at ████████████████, San Juan Capistrano, California 92675 ("SUBJECT RESIDENCE 2"), as described more fully in Attachment A-4; a 2014 Subaru Forester bearing California license plate ████████ ("SUBJECT VEHICLE 1"), as described more fully in Attachment A-5; a 2017 Toyota Tacoma bearing California license plate ██████ ("SUBJECT VEHICLE 2"), as described more fully in Attachment A-6, and a 2015 Kia Sportage bearing California license plate ███████ ("SUBJECT VEHICLE 3"), as described more fully in Attachment A-7, for the items to be seized described in Attachment B, which are the evidence, fruits, and instrumentalities of violations of 18 U.S.C. § 844(i) (Use of an Explosive or Fire to Damage Real Property Affecting Interstate Commerce); 26 U.S.C. § 5861(c) (Unlawful Possession of a Destructive Device); and 18 U.S.C. § 248 (Freedom of Access to Clinic Entrances) (the "SUBJECT OFFENSES").

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only and all dates and times are on or about those indicated.

### III. <u>SUMMARY OF PROBABLE CAUSE</u>

4.      In the early hours of March 13, 2022, ERGUL and BRANNON, who is an active duty Marine, drove from ERGUL's home (SUBJECT RESIDENCE 1) to a Planned Parenthood Federation of America clinic (hereinafter "Planned Parenthood") in Costa Mesa, California.  Once there, BRANNON and ERGUL ignited a Molotov cocktail and threw it at the entrance to the Planned Parenthood, starting a fire.  Approximately two hours later, ERGUL and BRANNON returned to the Planned Parenthood.  BRANNON then dropped ERGUL off and returned to his own home (SUBJECT RESIDENCE 2).

5.      The following morning, the Planned Parenthood was forced to close and cancel dozens of appointments, thus affecting its operations.

6.      The day after he and BRANNON started the fire, ERGUL texted an acquaintance, taking credit for the fire and noting that he wished he "could've recorded the combustion."  ERGUL sent the acquaintance a photograph depicting his gloved hand holding the Molotov cocktail from inside BRANNON's car.

7.      Accordingly, and for the reasons set forth below, there is probable cause to believe that ERGUL and BRANNON used an explosive or fire to damage real property affecting interstate commerce, in violation of 18 U.S.C. § 844(i).  There is also probable cause to believe that evidence of the SUBJECT OFFENSES will be found in the SUBJECT RESIDENCES, in which ERGUL and BRANNON reside, and in the SUBJECT VEHICLES, which ERGUL and BRANNON drive, including on their digital devices.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

**A.   ERGUL and BRANNON Use a Molotov Cocktail to Set Fire to a Planned Parenthood**

8.   Based on a March 13, 2022 Costa Mesa Police Department ("CMPD") report, in the early morning of March 13, 2022, CMPD officers and Costa Mesa Fire Department ("CMFD") firefighters responded to a fire at a Planned Parenthood located at 1520 Nutmeg Place in Costa Mesa, California, within the Central District of California.  CMPD Officer Bruno saw apparent burn marks on the door and adjacent wall that measured approximately three feet wide and approximately ten to fifteen feet tall. Officer Bruno also saw an unknown liquid and broken glass in the corner where the burn marks were located, consistent with the use of a Molotov cocktail.[1]  Below is a photograph of damage to the building:



---

[1]  Based on my training and experience, I know that a Molotov cocktail is a glass bottle containing a flammable substance and a source of ignition, which is designed to be lit and thrown, shattering on impact and igniting the flammable substance contained in the bottle.

9.   On March 13, 2022, CMPD Crime Scene Investigator Specialist Rueda arrived at the Planned Parenthood and collected multiple pieces of evidence, including but not limited to broken glass and a sample of liquids from the wall and glass window. CMPD retained a DNA sample from a swab of pieces of glass, which was deemed capable of direct comparison against DNA from an individual.

10.   On June 17, 2022, I interviewed Jesse Ramirez ("Ramirez") of Elite Private Security.  Ramirez told me that he was responsible for security at the Planned Parenthood clinic and was responsible for operating security systems, including reviewing recorded surveillance videos for the facility. Ramirez provided me with recorded videos of the March 13, 2022 incident.  Based on my review of the security videos, I saw the following:

a.    At approximately 12:55 a.m. PST, two individuals dressed in dark clothing walked southbound to a dumpster enclosure in the parking lot.  The first individual ("Subject 1") was wearing a dark hooded sweatshirt with the hood up, dark pants, dark shoes, a multicolored facial covering, and bright green/yellow gloves.  The second individual ("Subject 2", and together with Subject 1, the "Subjects") was wearing a dark hooded sweatshirt with a hood up, blue jeans, black and white shoes, a dark facial covering, and dark gloves.




Subject 1                              Subject 2

b.    The Subjects stood next to the dumpster enclosure, appearing to watch the front of the Planned Parenthood building for several minutes.  At approximately 12:59 a.m. PST, the Subjects jogged towards the front of the building. Subject 1 carried a large object in his/her left gloved hand.

Subject 2 jogged with his/her right hand inside of a pocket in his/her sweatshirt.

       c.   The Subjects hunched down in an area adjacent to the Planned Parenthood building just north of the door. The Subjects appeared to ignite a device, after which Subject 1 threw the device, which was then on fire, at the front door of the building.[2] The device landed against a southern wall next to the glass door and erupted into a fire, which spread up the wall and across the ceiling above the glass door.

       d.   Immediately after throwing the device, the Subjects ran northbound, away from the doors.

    11.   The Orange County Crime Laboratory analyzed samples collected by CMPD at the scene and documented its findings in a report. I read that report and learned that the laboratory determined that the liquid in and on a glass container and gauze sponges recovered from the Planned Parenthood contained gasoline.

    12.   On or about July 6, 2022, I interviewed employees of the Planned Parenthood, who informed me that on March 13, 2022, Planned Parenthood clinicians arrived at work, smelled what they thought was a gas or oil odor, and called 911. According to the employees, the Planned Parenthood was temporary closed as a result of the fire and odor and approximately 30 patients' appointments had to be rescheduled.

---

[2] Based on my review of a report prepared by CMPD Detective Korte, I am aware that Subject 1 threw this device at the doors at approximately 1:00 a.m. PST on March 13, 2022.

13.  On or about July 7, 2022, I interviewed the property manager for the 1520 Nutmeg Place property, where the Planned Parenthood is located.  The manager told me that he estimated the damage to the building to be about $1,050.  The cost included having a handyman employee repaint a portion of the exterior of the building, which appeared to have smoke damage. The handyman also pressure washed the concrete where the fire occurred.

14.  Open source searches for Planned Parenthood revealed that Planned Parenthood Federation of America provides support for affiliated Planned Parenthood healthcare clinics across the country, with national offices in New York City and Washington DC.  Planned Parenthood Federation of America is a 501(c)(3) nonprofit.  One of its affiliates is Planned Parenthood of Orange & San Bernardino Counties, which operates the Planned Parenthood Costa Mesa healthcare clinic located in Suite 101 at 1520 Nutmeg Place in Costa Mesa, California.  The Planned Parenthood Costa Mesa healthcare clinic provides reproductive health services, such as medical, counselling, or referral services relating to the human reproductive system, including services relating to pregnancy or the termination of a pregnancy.

**B.  FBI Identifies ERGUL and BRANNON as the Subjects Who Committed the Arson**

    1.    <u>A Witness Reports That ERGUL and BRANNON Committed the Arson</u>

15.  In January 2023, the FBI released a Seeking Information Poster[3], which included a reward of up to $25,000 for information leading to the identification, arrest, and conviction of the suspects responsible for the crime.

16.  On or about April 3, 2023, a witness[4] called the FBI's National Threat Operations Center stating that (s)he knew the identities of the Subjects.  I interviewed the witness by phone on or about April 4, 2023, and again in person on April 11, 2023.

17.  Based on the surveillance footage and the text messages described below, the witness identified Subject 1 as Tibet ERGUL (ERGUL) and Subject 2 as Chance BRANNON (BRANNON). The witness provided a telephone number ending in -2622 ("Subject Telephone 1") as ERGUL's number and a telephone number ending in -0045 ("Subject Telephone 2") as BRANNON's number. The witness knew ERGUL's and BRANNON's numbers because the witness was friends with BRANNON and ERGUL from high school.

18.  The witness advised that on March 14, 2022, ERGUL sent the witness text messages admitting his involvement in the SUBJECT OFFENSES, including photographs of the Molotov cocktail

---

    [3] A Seeking Information Poster is a poster that solicits the help of the public in identifying unknown suspects.

    [4] The witness's identity is known to the FBI.  I reviewed a criminal history check and confirmed that the witness does not have any criminal history.  The witness has not received and has not been promised any reward money.

used to start the fire and screen shots of calls for service at
the 1500 block of Nutmeg Place on March 13, 2022.  I reviewed
screen shot of those text messages and photographs, including
one text message in which ERGUL said the Molotov cocktail went
"BOOM [fire emoji]" at the "1500 Blk nutmeg plaza… Costa Mesa
health center/Planned Parenthood clinic" and said he wished he
"could've recorded the combustion."  The screen shots reflected
that they were sent from Subject Telephone 1.  As described
below, I have confirmed through subscriber and other records
that ERGUL uses Subject Telephone 1.

19.  The witness identified BRANNON based on BRANNON's
friendship with ERGUL, the witness's personal knowledge of what
BRANNON looks like, and a photograph ERGUL sent the witness on
March 14, 2022.  The photograph depicts a driver and passenger
inside a vehicle, with the passenger's gloved hand holding a
Molotov cocktail.  The witness believed the photograph was taken

from inside BRANNON's vehicle, which the witness knew to be a
red Dodge Challenger.  Below is the photograph:



20.  On approximately May 11, 2023, the witness consented
to a search of the witness's laptop, which contained the
original March 14, 2022 iMessages from ERGUL.  SA Ren Rudey took
screen shots of the messages.  I compared the screen shots the
witness provided with the shots provided by SA Rudey and
confirmed that they contain the same messages.

        2.    <u>BRANNON Drove a Vehicle Consistent With The One
the Subjects Used to Commit the Arson</u>

21.  On April 14, 2023, I reviewed records from the
California Department of Motor Vehicles ("DMV") indicating that
a 2016 Dodge Challenger, California license plate ▮▮▮▮▮▮ (the
"Dodge Challenger") was registered to BRANNON's stepfather at
SUBJECT RESIDENCE 2.

22.  On April 14, 2023, I reviewed military records stating
that BRANNON is an active duty Marine assigned to Marine Corps
Base Camp Pendleton.  On April 18, 2023, Naval Criminal

Investigative Service ("NCIS") Task Force Officer ("TFO") Sarah Weddle located the Dodge Challenger in front of barracks building 130117, which was listed as one of two possible residences for BRANNON in his military records.

23.   On April 20, 2023, TFO Weddle and NCIS SA Taylor McCreight conducted a spot check of barracks building 130117. SA McCreight observed that the room placard for Room 340, located on the third floor, showed the inhabitants as BRANNON and another Marine.  Additionally, TFO Weddle observed BRANNON exit the Dodge Challenger in the parking lot near barracks building 130117 and enter the third floor of the building.

       3.   <u>BRANNON's Phone Location Data Reflects That He Was in the Vicinity of the Planned Parenthood at the Time the Arson Occurred</u>

24.   As stated above, the witness identified Subject Telephone 1 as belonging to ERGUL and stated that he had used Subject Telephone 1 to communicate with ERGUL.  On April 14, 2023, I reviewed military records reflecting that ERGUL, who was listed as a character reference for another military applicant, could be reached at Subject Telephone 1.  On April 20, 2023, I reviewed ERGUL's [5]F-1 student visa application from the Department of Homeland Security's Student and Exchange Visitor Information System, in which ERGUL listed his telephone number as Subject Telephone 1.  On May 15, 2023, I reviewed T-Mobile records which reflect that from approximately November 11, 2018 through March 1, 2023, Subject Telephone 1 was registered to

---

[5] Based on information from Travel.State.Gov, I am aware that generally, a citizen of a foreign country who wishes to study in the United States must obtain a student visa.

ERGUL's mother.  Accordingly, I believe ERGUL uses Subject
Telephone 1.

25.  The witness also identified Subject Telephone 2 as
belonging to BRANNON and stated that he had used Subject
Telephone 2 to communicate with BRANNON.  On April 14, 2023, I
reviewed military records reflecting that BRANNON's telephone
number is Subject Telephone 2.  On May 15, 2023, I reviewed AT&T
records which reflect that the financially liable party for
Subject Telephone 2 is BRANNON's mother and the user is "CHANCE
B."  Accordingly, I believe BRANNON uses Subject Telephone 2.

26.  On April 27, 2023, in 2:23-MJ-02074, the Honorable
Alicia G. Rosenberg, United States Magistrate Judge, authorized
a warrant for historical cell site and phone location data for
Subject Telephones 1 and 2.  Based on information received from
T-Mobile in response to that warrant, I am aware that due to T-
Mobile's retention policy, there was no cell site data available
for ERGUL's phone (Subject Telephone 1) dating back to March
2022.  However, based on information received from AT&T pursuant
to the warrant, I am aware of the following:

a.  From approximately 7:27pm through approximately
8:55pm PST, BRANNON was in the vicinity of Ladera Ranch,
California. As described below, I know that BRANNON lives at
SUBJECT RESIDENCE 2, which is just north of Ladera Ranch.

b.  From approximately 9:17 p.m. through
approximately 9:28 p.m. PST on March 12, 2022, BRANNON was in
the vicinity of SUBJECT RESIDENCE 1, which as described below, I

know to be ERGUL's home.  BRANNON called ERGUL at approximately 9:22 p.m. PST.

c.    From approximately 11:07 p.m. PST on March 12, 2022, through approximately 1:03 a.m. PST on March 13, 2022, BRANNON was in the vicinity of the Planned Parenthood.

d.    At approximately 3:03 a.m. PST, BRANNON returned to the vicinity of the Planned Parenthood, before returning to ERGUL's home at approximately 3:26 a.m. PST.

e.    At approximately 4:01 a.m. PST, BRANNON returned to the vicinity of Ladera Ranch.

**C.    BRANNON and ERGUL Drive the Subject Vehicles and Live at the SUBJECT RESIDENCES**

1.    ERGUL Lives at SUBJECT RESIDENCE 1 and Drives SUBJECT VEHICLE 1

27.    On April 12, 2023, CBP ("Customs and Border Protection") TFO Tony Vuong conducted a CBP database check for ERGUL and saw that on approximately February 22, 2023, ERGUL received a shipment to SUBJECT RESIDENCE 1.

28.    On April 14, 2023, SA Daniel Dales conducted a spot check of SUBJECT RESIDENCE 1 and observed that it is an apartment located on the third floor of a large apartment complex.  On June 6, 2023, SA Dales received records from the Irvine Company reflecting that ERGUL's mother is listed on the lease for SUBJECT RESIDENCE 2.  The lease began on February 1, 2023.

29.    On April 28, 2023, SA Tyler Novak conducted surveillance at SUBJECT RESIDENCE 1 and saw ERGUL at the base of a staircase in the vicinity of SUBJECT RESIDENCE 1.  SA Novak

then saw ERGUL enter SUBJECT VEHICLE 1, which was parked in a parking lot near SUBJECT RESIDENCE 1. Based on DMV records, I know that SUBJECT VEHICLE 1 is registered to ERGUL's mother and that ERGUL does not have any vehicles registered to him.

30. Based on reports received from the Tempe, Arizona Police Department, I am aware that on or about October 21, 2022, ERGUL was arrested for aggravated assault, unlawful imprisonment, and criminal damage after punching his roommate in the nose and breaking the doorknob so she could not leave their shared apartment.[6] I reviewed audio of the 911 call associated with that incident, in which ERGUL's then-roommate stated that ERGUL drives a Subaru.

31. On June 7, 2023, I reviewed ERGUL's publicly available Instagram page and saw that in June 2022 and July 2022, ERGUL posted multiple photos featuring SUBJECT VEHICLE 1.

32. On June 8, 2023, I saw SUBJECT VEHICLE 1 parked in front of garage space #508 near SUBJECT RESIDENCE 1. Later that day, SA Dales spoke with a Security Director for Irvine Company who confirmed that the residents of SUBJECT RESIDENCE 1 rent garage space #508.

33. Based on the foregoing, I believe ERGUL lives at SUBJECT RESIDENCE 1 and drives SUBJECT VEHICLE 1.

      2.   <u>BRANNON Lives at SUBJECT RESIDENCE 2 and Drives SUBJECT VEHICLES 2 and 3</u>

34. As stated above, I reviewed DMV records reflecting that the Dodge Challenger was registered to BRANNON's

---

[6] Based on NCIC records, I am aware that as of February 2023, prosecution on these charges has been deferred.

stepfather, Bing Crosby ("Crosby"), at SUBJECT RESIDENCE 2. DMV records reflect that BRANNON's address is SUBJECT RESIDENCE 2.

35. Based on license plate reader records, I know that on May 30, 2023, the Dodge Challenger was parked in the lot of an auto body and paint shop. On June 2, 2023, NCIS TFO Andrew Emley spoke to an employee of the body shop, who confirmed that the Dodge Challenger had been purchased by a car dealership and was being prepared for resale. TFO Emley photographed the inside of the Dodge Challenger. Based on those photographs, I believe the Dodge Challenger is the same car depicted in the photograph ERGUL sent to the reporting witness on March 14, 2022.

36. On June 3, 2023, SA Daniel Dales spoke with the General Sales Manager at Claremont Toyota, who relayed that on May 12, 2023, Crosby traded in the Dodge Challenger and paid cash to purchase SUBJECT VEHICLE 2. SA Dales then spoke telephonically with the salesman who sold SUBJECT VEHICLE 2 to Crosby. The salesman relayed that Crosby purchased SUBJECT VEHICLE 2 for his son, who was present. The salesman saw the son transfer all of his items from the Dodge Challenger into SUBJECT VEHICLE 2, including a television and a large military bag. The salesman relayed that the son was in the military and was planning to move to Idaho in July.

37. SA Braden Ballantyne saw SUBJECT VEHICLE 2 parked in the driveway of SUBJECT RESIDENCE 2 on May 25, 2023. On June 10, 2023, I reviewed DMV records reflecting that SUBJECT VEHICLE 2 is registered to Crosby at SUBJECT RESIDENCE 2.

38.  On May 31, 2023, NCIS TFO Weddle learned from BRANNON's command that he had been reassigned to room 301 in barracks building 130117, down the hall from his previous room. On June 2, 2023, I learned from NCIS that room 301 appeared to be vacant.

39.  On June 2, 2023, NCIS TFO Weddle learned from BRANNON's command that he is currently on a skill bridge assignment.  Based on my experience and conversations with other law enforcement agents, I know that a skill bridge assignment is similar to an internship for Marines preparing to leave active duty.

40.  On June 6, 2023, NCIS TFO Weddle learned from BRANNON's command that BRANNON has completely checked out of his barracks and is living at SUBJECT RESIDENCE 2 with his family.

41.  On June 6, 2023, at approximately 7:03 a.m. PST, SA Dales saw BRANNON leave SUBJECT RESIDENCE 2 and enter SUBJECT VEHICLE 3.  Based on DMV records, I know that SUBJECT VEHICLE 3 is registered to Crosby at SUBJECT RESIDENCE 2.

42.  On June 8, 2023, at approximately 7:09 a.m. PST, I saw BRANNON leave SUBJECT RESIDENCE 2 and enter SUBJECT VEHICLE 3.

## V.  TRAINING AND EXPERIENCE ON DOMESTIC TERRORISM OFFENSES

43.  Based on my training and experience, individuals who commit violence in furtherance of their political and/or social agendas often keep evidence of their criminal activities, including plans, mementos, photographs, communications with coconspirators, and other materials in places that are readily

accessible and in which they feel comfortable, such as their cars, homes, and on their personal digital devices.

## VI.  TRAINING AND EXPERIENCE RELATED TO DNA

44.  Fluids and tissues of the human body such as blood, saliva, and semen contain DNA, which is a chemical substance that contains genetic code.  DNA typing techniques commonly used in forensic laboratories can detect differences in the DNA codes from person to person and are a powerful method for excluding or including an individual as the source of a biological fluid or tissue.  In order to compare DNA profiles obtained from evidence and the DNA profile of an individual, a sample of body fluid must be obtained from the individual.  Because the DNA code is the same within an individual, any body fluid (e.g., saliva) can be used to obtain a DNA profile.

## VII. TRAINING AND EXPERIENCE ON DIGITAL DEVICES[7]

45.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have

---

[7] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain

software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

        d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

    46.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

        b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000

average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

47.   The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.   In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.   Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that

appears to have a biometric sensor and falls within the scope of the warrant: (1) depress BRANNON's and ERGUL's thumbs and/or fingers on the device(s); and (2) hold the device(s) in front of BRANNON's and ERGUL's faces with their eyes open to activate the facial-, iris-, and/or retina-recognition feature.

## VIII. <u>REQUEST FOR USE OF REASONABLE FORCE</u>

41. Based on my training and experience, and the nature of the criminal conduct described above, I believe ERGUL and BRANNON may refuse to comply with any court-authorized efforts to obtain their DNA. Accordingly, I also respectfully request authority to use reasonable force in order to obtain DNA samples.

## IX. <u>CONCLUSION</u>

42. For all the reasons described above, there is probable cause to believe that ERGUL and BRANNON violated 18 U.S.C. § 844(i) (Use of an Explosive or Fire to Damage Real Property Affecting Interstate Commerce).

//

//

//

//

//

//

//

//

//

//

43.    Further, there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits, and instrumentalities of violations of the SUBJECT OFFENSES, will be found at or in the SUBJECT PREMISES and SUBJECT VEHICLES, as described in Attachment A.


Attested to by the applicant in
accordance with the requirements of
Fed. R. Crim. P. 4.1 by telephone on
this 12th day of June, 2023.

_____
HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE